## SOMMA v. OCEAN S. S. CO., Limited, et al.
### Civ. No. 11294.

United States District Court
E. D. New York.

May 5, 1952.

Ralph H. Faiella, Brooklyn, N. Y. (Jacob Rassner, New York City, of counsel), for plaintiff.

Thomas F. Keane, Brooklyn, N. Y. (Vernon S. Jones, New York City, of counsel), for defendants.

GALSTON, District Judge.

This is a civil action for damages for injuries alleged to have been caused the plaintiff by a maritime tort alleged to have been committed by the defendant. The plaintiff waived a jury.

The plaintiff was employed as a longshoreman by the Associated Operating Corporation. On November 6, 1950, while so employed, he was engaged with other longshoremen or stevedores in handling cargo on board the S. S. Agamemnon, a British vessel owned by the defendant, Ocean Steamship Company, Ltd., a British corporation. The complaint as against the defendant, Funch, Edye & Company, Ltd., the operating agent and New York representative of the Ocean Steamship Company, Ltd., was dismissed, on consent, at the beginning of the trial.

The accident which resulted in the injury to the plaintiff occurred on board the S. S. Agamemnon, then docked at Pier 1, Bush Docks, Brooklyn, New York, while the longshoremen were engaged in "spotting" or "topping" a boom.

A detailed description of the operation is necessary to an understanding of the claim made by the plaintiff. It appears that in the course of their work it became necessary for the longshoremen to change the position of the boom in question. The boom was held in position by means of a wire cable known as a "topping lift". This wire cable, as it was rigged on the S. S. Agamemnon, started at the top of the mast and led from there horizontally out to the top of the boom. There the cable passed through a block or pulley and then led

back ·to the top of the mast. It passed through a block located there and then down vertically to a block or pulley at the foot of the mast, known as a heel block. From the ·heel block, the cable went to two bitts on the deck which formed a cleat. The cable was wound around this cleat and supported the entire weight of the boom.

To raise the boom as required for the ·longshoremen to complete the work they were then doing, it was necessary to use .winch power. Because the entire strain and weight of the boom were on the topping lift cable as it was wound around the cleat, it was necessary first to take the strain off this cable so that its end could be passed around· the cathead of the winch. The device used which temporarily takes the strain so that the topping lift cable can be unwound from the cleat and put on the drum of the winch, is known as a "stopper chain". The stopper chain used by the longshoremen on November 6, 1950, ·was from two to three feet long and made of steel. The individual links of the chain were about an inch and a half or two inches in size and in thickness being about. that of a pencil. There was attached to one end of the chain a length of rope. about two feet long and about a half an inch thick. ..The end without the rope was anchored by being fastened to a ring bolt on the deck.

The longshoreman who put on the stopper chain at the time the plaintiff suffered his injury testified that he wound the chain around the topping lift by applying three half hitches and then· winding the remainder of· the chain· with the rope around the topping lift cable and holding the wound rope tightly against the cable. He testified that this was the established custom and manner of applying a stopper chain when topping a boom, and that he had used the same method "several hundreds of times at least". On the occasion in question, after the stopper chain had been applied, other longshoremen took a few turns of the topping lift cable off the cleat to see whether the stopper chain was holding. Then the cable was taken off the cleat and placed on the drum of the winch. According to the testimony, the stopper chain held

the full weight of the topping lift cable for about forty seconds, but then,. before the ·weight of the cable could be transferred to the winch, the cable began to slip through the stopper chain. This resulted in the. release of the boom's support, causing it to fall to the deck and injuring the plaintiff.

At the outset, the plaintiff predicated his right of recovery on several grounds. The complaint alleges negligence on the part of the defendant and its employees, failure of the defendant to provide the plaintiff with a safe place to work in that the equipment furnished was defective and not in a seaworthy condition, and failure of the defendant, through its employees, to properly supervise the work in which the plaintiff was engaged. Following the first trial, which was declared a mistrial, the complaint was amended, by order of the court, to include an additional allegation that there was failure to provide a safe place to work, in that the only means provided to hold· the boom while the cable was being moved from the cleat to the winch was a stopper chain, and that such means was not a safe method. During the trial, however, the plaintiff abandoned all but one of the grounds and asserted that he would rely, on the question of liability, solely on his claim that the vessel was unseaworthy in that the stopper chain furnished and used in the operation involved was defective.

█ The defendant contends that English law governs here, since the accident occurred on board a vessel flying the British flag; while the plaintiff contends that American law, as applied in such cases as Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and Uravic v. F. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312 is applicable. Insofar as the issue of seaworthiness is concerned, which is the only issue involved here, a seaman is entitled to rely on a warranty of seaworthiness under either English or American law. In The Osceola, 189 U.S. 158, at page 175, 23 S.Ct. 483, at page 487, 47 L.Ed. 760, the Supreme Court stated:

"Upon a full review, however, of English and American authorities upon these questions, we think the law may.

be considered as settled upon the following propositions:

"1. * * *

"2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship."

See also Mahnich v. Southern Steamship Co., 321 U.S. 96, 99-100, 64 S.Ct. 455, 88 L. Ed. 561.

■ It is a well-recognized policy in our law to give longshoremen or stevedores, doing the sort of work which the plaintiff was doing here, like protection against injuries due to unseaworthy conditions as that given to seamen. Seas Shipping Co. v. Sieracki, supra. The parties are silent as to whether the British law has similarly extended the application of the warranty of seaworthiness to stevedores and longshoremen. The absence of such extension would, of course, preclude the plaintiff from recovering thereunder.

■ Assuming for the moment that the plaintiff is entitled to rely on the warranty of seaworthiness, however, the plaintiff's evidence falls short of any showing of unseaworthiness. Cipriana, the longshoreman who applied the chain stopper to the topping lift cable, testified that the method he followed in topping the boom on this occasion was the same as that he had used several hundreds of other times, and that it was safe and good practice to do it that way. On the other hand, William Cochrane Ferguson, the chief officer of the S. S. Agamemnon, testified that there is no guarantee that the stopper chain will hold when put on in the way described by Cipriana. According to Ferguson the proper and safe way to use the stopper chain is to hold the end of the rope, which is attached to one end of the chain, extended rigidly out from the cable and not wrapped around and held against the cable. He stated that holding the end of the rope thus extended would keep the necessary tension on the stopper chain so as to prevent any relaxing of the friction between the stopper chain and the topping lift cable.

Under the plaintiff's theory of the case, the critical question here is whether the stopper chain was defective. It is his contention that when the weight of the boom on the topping lift cable was applied to the stopper chain, portions of the chain scaled off, causing the chain and cable to slip. Cipriana testified that he saw rust coming off either from the cable or the stopper chain as the cable was slipping through the stopper chain. He also found rust on his hands. On cross-examination he admitted that he saw no rust on the stopper chain at any time while he was applying it around the topping lift cable. He did see rust on the cable, but stated that such rust could not have caused the accident, and, in his opinion, was not dangerous. The following also appears in his testimony, as part of the cross-examination:

"Q. Well, Mr. Cipriana, is it your testimony here today to this Court that this accident was caused by some rust on the cable or on the chain? A. I say it could be dangerous.

"Q. But—. A. But I don't say that is the cause that the boom came down."

Joseph Dito, another longshoreman of the gang working on the S. S. Agamemnon on the day in question, also testified to seeing "quite a bit of scale from the chain," and that the scale "was on the floor from the chain and the topping fall".

In testifying with respect to the condition of the stopper chain, Ferguson, who was notified of the accident shortly after it occurred, stated that he looked at the gear, including the stopper chain in question, and found it all in good condition. He saw no pitting or flaking of rust on the chain. He also testified that he found no flakes or pieces of rust on the deck. All he saw were the ordinary dust found on exposed equipment and rust which forms on steel surfaces due to oxidation. He testified, in part, as follows:

"Q. Will you tell the Court what the condition of the chain stopper was? A. Well, when a thing slides down like that, there is notching in bar metal

and these chains are annealed and in the processing or annealing thin scale is formed on the surface.

"Q. You mean a thin scale of rust? A. What they call mill.

\* \* \* \* \* \*

"Q. And is that a comparatively common thing that occurs on all steel chains and on deck? A. Unless the steel is pickled first and then connected with a notch crossing you will always have that."

In this connection there also is testimony by John Fleming, a marine ship architect, who took the stand for the defendant as an expert, as follows:

"A. Well, the whole function of the chain stopper is one of friction,— this was evidenced here very clearly, —and any smooth surfaces breaking over each other have little friction. If there are rough surfaces, then greater friction, that is, if you have a rusty chain you have a greater holding power.

"Q. With rust on the chain links, is there less likelihood of the cable slipping through the turns, half turns of the chain? A. Yes, there is less likelihood."

On cross-examination, the following questions and answers were given:

"Q. Assuming that a stopper chain has hard scale which comes away after some fatigue of about forty seconds or from forty seconds to two minutes, that the scale comes away so that part of the scale is actually seen at and about the chain on deck after the accident, would you consider that kind of chain a safe chain for the purpose —yes or no? A. Yes.

"Q. You would consider that safe? A. Yes, sir."

Ferguson also testified that the stopper chain in question was used on other occasions, both before and after the accident, and that it always held the boom's weight without any slipping or sliding of the cable. This was corroborated by the deposition of the sarang, or boatswain, of the S. S. Ag-amemnon, who actually applied the stopper chain in topping the boom on these other occasions.

 The situation here is not one where the doctrine of res ipsa loquitur is applicable. Moreover, evidence that rust was found on the deck, whether that rust is called dust, scale or mill, following the accident does not compel the conclusion that the stopper chain was defective. The friction between the chain and the topping lift cable, as the latter was sliding through the chain from the weight of the falling boom could cause the rust to scrape off. What is fundamental, however, is whether there was scaling or flaking of the chain sufficient to cause the initial slipping or release of the friction through which the stopper chain held the cable.

The best proof of the condition of the stopper chain would, of course, be the chain itself; but it is not in evidence. The only evidence supporting the plaintiff's theory is the testimony of Cipriana and and Dito that rust or scale was found near the stopper chain after the accident. There is nothing to indicate the extent of the flaking or scaling. Nor is there any evidence that any of the longshoremen at the scene of the accident examined the stopper chain to see whether it was pitted or flaking. According to both men the rust could have come off the topping lift cable as well as the chain. Cipriana stated that the presence of rust on the topping lift cable could not have caused the accident. Moreover, although he declared that rust on the chain might be dangerous, he declined to say that the rust on the chain was actually the cause of the boom falling.

Nor does the plaintiff dispute the opinions of Ferguson and the marine expert, Fleming, that rust on the chain, by increasing the friction of the surfaces, would aid in holding the cable. There is too the testimony of Ferguson and the boatswain that the stopper chain in question was regularly used before and since, in the customary and usual way, without slipping.

In weighing the evidence presented, it must be concluded that the plaintiff has

failed to prove that the accident causing his injuries was due to the stopper chain being defective.

The complaint will be dismissed.

Appropriate findings of fact and conclusions of law will be filed concurrently with this opinion.